PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ROBERT C. STEINBURG,
                    *Plaintiff-Appellant,*

v.

CHESTERFIELD COUNTY PLANNING
COMMISSION; DANIEL A. GECKER, in
his official capacity; SHERMAN W.
LITTON, in his official capacity,
                    *Defendants-Appellees.*

No. 07-1181

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(3:06-cv-00248-REP)

Argued: January 31, 2008

Decided: May 29, 2008

Before NIEMEYER and SHEDD, Circuit Judges,
and Patrick Michael DUFFY, United States District Judge for the
District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Shedd and Judge Duffy joined.

## COUNSEL

**ARGUED:** James Broome Thorsen, THORSEN & SCHER, L.L.P.,
Richmond, Virginia, for Appellant. Steven Latham Micas, County

Attorney, COUNTY ATTORNEY'S OFFICE FOR THE COUNTY OF CHESTERFIELD, Chesterfield, Virginia, for Appellees. **ON BRIEF:** Jeffrey L. Mincks, Stylian P. Parthemos, COUNTY ATTORNEY'S OFFICE FOR THE COUNTY OF CHESTERFIELD, Chesterfield, Virginia, for Appellees.

---

## OPINION

NIEMEYER, Circuit Judge:

Robert Steinburg, a citizen of Chesterfield County, Virginia, contends that on October 18, 2005, the Chesterfield County Planning Commission and two of its members violated his First Amendment rights when the chairman of the Commission had him removed from a public meeting of the Commission. Steinburg commenced this action, contending that he was unconstitutionally silenced while speaking because the commissioners disagreed with the viewpoint he expressed, which criticized the way in which the Commission was conducting its business.

The district court entered summary judgment in favor of the defendants, finding that Steinburg was removed from the podium and the meeting because he refused to address the only topic for which the public hearing had been opened and because he behaved in a hostile manner that threatened to disrupt the orderly progress of the meeting. The court simultaneously denied Steinburg's motion to amend his complaint to assert additional claims and add a new defendant because it found that such amendments were untimely and would be futile in light of the fully developed record before it.

We agree with the district court that Steinburg was excluded from the public meeting because of his refusal to address the topic for which the meeting was opened and because of his disruptive manner, and not because of any viewpoint he expressed. Inasmuch as the Commission was authorized to set its subject matter agenda and to cut off speech that was reasonably perceived to threaten disruption of the orderly and fair progress of the meeting, we conclude that the Commission and its members did not violate Steinburg's First Amendment

rights in excluding him. We also find that the district court did not abuse its discretion in denying Steinburg's motion to amend his complaint. Accordingly, we affirm.

I

The Chesterfield County Planning Commission, created under Virginia Code § 15.2-2210 "to promote the orderly development of the locality and its environs," conducts regular public meetings, which are generally videotaped for local television broadcast, as was the October 18, 2005 meeting, from which this case arose.

Some time prior to October 18, 2005, Robious Investments LLC, a developer, had filed an application with the Commission for an amendment to the zoning ordinance governing its development known as the Tarrington Subdivision. The application requested that the Commission change the zoning ordinance to permit development of homes with front-facing, rather than side-facing, garages. The application was scheduled to be heard at the October 18 meeting, but at some point shortly before the meeting, Robious filed a request that the Commission defer consideration of its application until the Commission's next meeting in November.

Acting in accordance with the Commission's bylaws, Commission Chairman Sherman Litton invited citizens at the October 18 meeting to speak only on the limited issue of whether to grant Robious' request to defer consideration of its application for a zoning change, and as Nancy Frantel, a county citizen, approached the podium to speak, Chairman Litton reiterated that the subject of the hearing was "just on the deferral." Acknowledging the limited subject matter, Frantel delivered a presentation in which she stated her support for the deferral request and frequently mentioned the garage-door issue. Her main point, however, was to express her concern about the presence of a network of abandoned mine shafts below the surface of the earth where certain sections of the Tarrington Subdivision would be built. Frantel spoke for approximately six minutes, without interruption from Commission members, speaking calmly and respectfully throughout. After Frantel concluded her remarks, Commissioner F. Wayne Bass asked follow-up questions because, as he later explained, he had not been on the Commission when the Tarrington Subdivision

was originally zoned. Commissioner Bass and Frantel exchanged comments about the mines for an additional two to three minutes.

Before the next speaker, Mike Harton, approached the podium, Chairman Litton asked him whether he was in favor of the deferral, indicating that "I'd rather not hear the case tonight." Harton replied, "I will speak to the deferral, sir." Like Frantel before him, Harton mentioned the deferral of the hearing on Robious' application to reorient the garage doors, but then he too turned to the potential hazards of the abandoned mines. When Harton had spoken for about two minutes about the mines, Commissioner Daniel Gecker asked Harton whether he was in favor of or opposed to the deferral. Harton replied that he was in favor of the deferral and then attempted to resume his presentation on the abandoned mines. Chairman Litton interrupted him and stated, "Sir, we get to hear this case next month. If you're, if you're opposed to the deferral or for it, then let's talk to the deferral, but I don't want to hear the case tonight. The case is going to come back, and you'll have a chance to present all your documentations at that time." Harton responded that he wanted to show the Commission why he thought they should "reconsider this altogether when the deferral comes up," asserting that the abandoned mines created "a serious safety hazard here, regardless of how the garage doors are oriented. It makes no difference whether they're on the front, the back or the side." Harton concluded his comments by encouraging the Commission both to defer the case and to "look seriously at the dangers involved of building over a cobweb of mines." Again, Harton's presentation was made calmly and respectfully throughout.

After Harton yielded the floor, Commissioner Gecker called on the developer's representative, William Shewmake, to clarify the issue of the abandoned mines. Commissioner Gecker acknowledged that "this doesn't deal with the deferral, Mr. Chair, but since you have let everybody else speak long past the deferral issue, maybe we can put this one to bed also." In an exchange that lasted less than a minute, Shewmake confirmed that the developer had hired a firm to survey the property to determine the location of any abandoned mine shafts before development was to begin.

In response to Chairman Litton's invitation for further public comment on the deferral request, Robert Steinburg came to the podium.

But unlike the previous two speakers, he made no effort to relate his comments to either the developer's deferral request or the orientation of the garages. Because it is the subject matter, as well as the tone, of Steinburg's speech that is at issue, his presentation is reproduced in full:

> Good evening, ladies and gentlemen, my name is Bob Steinburg, and I am President of the Old Gun Road Civic Association, which represents 600 homes in the historic Old Gun Road corridor. And uh, we have some, we had our annual picnic here last week, and I can tell you that there is a great deal of concern about this particular project, and uh, these are health and safety concerns that are not only environmental in nature, but you've heard a great deal tonight from the speakers who have stepped up to the bar so far.

> Now I, I understand that you're not making a decision as it relates to this particular issue this evening, but I think it is very, very important to apprise you, if you are not already aware, that uh, this is an issue that people - it's a very volatile issue. I've lived in this corridor for thirty years, and I can tell you I haven't seen people this hot about anything like this, ever.

> This is a *very serious* issue. One of the things that troubles me when some of these things are being presented this evening is a lot of bantying [sic] about back and forth by some of you who don't seem to be paying attention, or else are talking about something that perhaps, uh, might not even be related. And I can tell you that perception is reality in the eyes of many. What you are talking about, I have no idea. Mr. Gecker, you in particular, leaning over and saying this, that, and the other thing, but I can tell you from a perception standpoint from someone who is concerned, like myself and the others in this room, it's not very flattering. Believe me.

After Steinburg had spoken for less than two minutes, Commissioner Gecker interjected, and the following exchange took place:

| | |
|---|---|
| COMMISSIONER GECKER: | Mr. Steinburg, abusing this podium is not very flattering — |
| STEINBURG: | That is not abusing the podium, sir. That is *not* abusing the podium. I am telling you what I observed. I am a citizen. I am representing 600 households here at their bequest [sic] tonight, and you will listen to what I am saying. Sir. |
| COMMISSIONER GECKER: | No, sir, you will not talk to me that way. I am not going to listen to what you've got to say on a deferral motion when you come up and speak to something other than the deferral. The Old Gun Road Association — |
| STEINBURG: | That *is* with regard to the deferral, sir — |
| COMMISSIONER GECKER: | — that you represent supported the Tarrington rezoning — |
| STEINBURG: | [shouting] Mr. Gecker, would you please give me the right to speak? Who do you think you are? |
| CHAIRMAN LITTON: | I'm going to cut you off. I'm Chairman, I can cut — |
| STEINBURG: | Mr. Litton, yes you can, you can do that. |

CHAIRMAN LITTON: And I am. This has gone way past. I've given you the courtesy. This is nothing but a deferral. This has nothing to do with the case. So just please sit down.

STEINBURG: I'm *not* sitting down. I'm not done talking yet. Ask Kirk Turner, he knows me. I'm not a wild citizen.

COMMISSIONER GECKER: Is there — Mr. Turner, is that right?

STEINBURG: Let me speak!

CHAIRMAN LITTON: I, you know, I've, I've heard enough on this case tonight. I'm going to cut it off, okay.

STEINBURG: Can you tell me why you're cutting it off?

CHAIRMAN LITTON: Because it's strictly a deferral, and we're not arguing the case tonight. The case will be discussed at some time, at a later time. If you're telling me that you're in favor of the deferral, that's all I need to know. If you don't want the deferral, then that, you can argue —

STEINBURG: You don't want any background information on any-

|  |  |
|---|---|
|  | thing. I, it sounds to me like you people have already made up your mind as to what you're going to do. |
| CHAIRMAN LITTON: | I don't need the information tonight because I'm going to hear the case again next month. |
| STEINBURG: | I understand that, sir. All I'm asking for is respect from you. I'll give you respect, you give me respect. That's all I want. |
| CHAIRMAN LITTON: | I'm asking you just to sit down, please. |
| STEINBURG: | I know you are. I understand what you're doing. And when I am through speaking I will sit down. |
| CHAIRMAN LITTON: | No, I think you're going to sit down now. |
| STEINBURG: | I'm not! |

At that point, Chairman Litton directed a request to Police Officer James Profita, who had entered the meeting room in response to an electric alarm that had been pressed by Kirk Turner, the Chesterfield County director of planning who, by virtue of his position, served as secretary of the Commission.

CHAIRMAN LITTON (to Officer Profita):

Would you ask him to sit down, sir?

OFFICER PROFITA (to Steinburg):

Sir, you can sit down right now, or you can come with me. It's come to that option.

STEINBURG: And why am I sitting down?

OFFICER PROFITA: Disorderly conduct, for one.

STEINBURG: This is disorderly conduct in a public forum?

OFFICER PROFITA: Yes, sir, they've asked you to sit down and you're not cooperating.

STEINBURG: Let the record show that this gentleman has just asked a citizens [sic] from Chesterfield County who is speaking to this issue to sit down. *This* is what is wrong with the County of Chesterfield. *This* is what you people are doing.

[Profita approaches Steinburg]

I'll go with you! Just hang on.

OFFICER PROFITA: You're done speaking. You're done speaking.

STEINBURG: Show me the way!

| OFFICER PROFITA: | You're done speaking, please. Let's go. [Profita places his hand on Steinburg's arm. Steinburg places his hand on Profita's side.] Get your hands off of me. |
| STEINBURG: | Get your hands off of *me*! |
| OFFICER PROFITA: | You're done. Put your hands behind your back. |
| | [Profita and another officer escort Steinburg from the podium and out of the meeting room.] |

After Steinburg was removed from the meeting, the Commission agreed that the only issue before it was Robious' deferral request and, following a motion, voted to grant the request, postponing the hearing for 30 days on its application for a zoning change.

In April 2006, Steinburg commenced this action against the Commission, Chairman Litton, and Commissioner Gecker in their official capacities, seeking an injunction prohibiting the defendants from restraining his speech and, in particular, prohibiting enforcement of the Commission's policy prohibiting "personal attacks" during meetings. He also requested compensatory and punitive damages.

On cross-motions for summary judgment, the district court entered judgment in favor of the defendants, concluding that the incontrovertible evidence showed that Chairman Litton, not Commissioner Gecker, restricted Steinburg's speech and that "he did so after repeatedly informing all speakers that the topic to be addressed was the request for deferral." The court also concluded that because there was insufficient evidence to prove that Steinburg was silenced because of the Commission's policy against personal attacks, it would not reach the question raised by Steinburg of whether that policy was unconsti-

tutional. At the same time that the court decided the summary judgment motions, it also issued an order denying Steinburg's request to amend his complaint to sue the individual defendants in their individual capacities, to challenge the Commission's time, place, and manner restrictions on speech, and to add Officer Profita as a defendant. The district court denied that motion because it violated the controlling scheduling order and because the amendments sought would be futile.

Steinburg appealed, challenging both the district court's grant of summary judgment to the defendants and its refusal to allow him to amend his complaint.

II

For his principal argument, Steinburg contends that Chairman Litton and Commissioner Gecker unconstitutionally silenced his speech (1) by enforcing the unconstitutional Commission policy against "personal attacks" and (2) by cutting off his right to speak, based on his viewpoint. He points to Commissioner Gecker's accusation that Steinburg was "'abusing the podium' . . . as soon as Steinburg criticized him by name" and to Chairman Litton's immediate intervention to "cut off Steinburg after he criticized Gecker and the Commission for their handling of the deferral debate" and have him removed from the public meeting. Steinburg argues that the defendants had "no power to restrict [his] expression because of its message, its ideas, its subject matter, or its content."

We address Steinburg's double-layered argument first by addressing his assertion that the Commission, in cutting off his speech, was enforcing an unconstitutional policy that prohibited speakers from engaging in "personal attacks" and then by addressing his claim that Chairman Litton's cutting him off and excluding him from the meeting silenced his speech based on his viewpoint. But we begin by recognizing with respect to both layers of Steinburg's argument that the standards for determining whether the Commission unconstitutionally restricted Steinburg's speech in a public forum depend on the nature of the forum. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001).

In the traditional public forum, which includes the streets, sidewalks, parks, and general meeting halls, speakers' rights are at their

apex. Speakers have a right to speak free of any government-imposed restrictions on their speech unless the restrictions are reasonable time, place, and manner restrictions; are content-neutral; and are "narrowly tailored" to serve a significant governmental interest. *See Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 295 (1984). In addition, content-based restrictions may be imposed in a traditional public forum where there is "a clear and present danger that [the speech] will bring about the substantive evils that [government] has a right to prevent," *Schenck v. United States*, 249 U.S. 47, 52 (1919), and where the restrictions are narrowly drawn to serve that compelling state interest, *see Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Schs.*, 457 F.3d 376, 381 (4th Cir. 2006) (citing *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 45 (1983)).

Distinct from the traditional public forum is the "limited public forum," which governmental entities may create in a specified location for a limited use, so long as they do not impose those limits in a manner that discriminates based on the speaker's viewpoint. Thus, "[w]hen the State establishes a limited public forum, the State is not required to and does not allow persons to engage in every type of speech. The State may be justified 'in reserving [its forum] for certain groups or for the discussion of certain topics.'" *Good News Club*, 533 U.S. at 106 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (second alteration in original)). In a limited public forum, however, the government still "'must not discriminate against speech on the basis of viewpoint,' and any restriction 'must be reasonable in light of the purpose served by the forum.'" *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067-68 (4th Cir. 2006) (quoting *Good News Club*, 533 U.S. at 106-07).

In this case the parties agree that the Commission's public meeting was a "limited public forum," and we concur in that assessment. Accordingly, a government entity such as the Commission is justified in limiting its meeting to discussion of specified agenda items and in imposing reasonable restrictions to preserve the civility and decorum necessary to further the forum's purpose of conducting public business. But any restriction must not discriminate on the basis of a speaker's viewpoint. *See Good News Club*, 533 U.S. at 106-07; *Col-*

*linson v. Gott*, 895 F.2d 994, 1000 (4th Cir. 1990) (Phillips, J., concurring).

In *Collinson*, through three separate opinions of the three panel members, we held that the chairman of a board of county commissioners was entitled to immunity against a claim that he had violated the free speech rights of a man by ruling him out of order while speaking at a board meeting and having him removed from the meeting by the police. While we do not rely on *Collinson*'s immunity holding, we do accept the uncontroversial contours of the government's ability to restrict speech in a limited public forum, as summarized by Judge Phillips in his concurring opinion:

1. Speech at public meetings called by government officials for discussion of matters of public concern is entitled to normal first amendment protections against general restrictions or *ad hoc* parliamentary rulings by presiding officials. *City of Madison*[*, Joint Sch. Dist. No. 8 v. Wisc. Employment Relations Comm'n*], 429 U.S. [167,] 175-76 [(1976)], 97 S. Ct. at 426-27.

2. Because of government's substantial interest in having such meetings conducted with relative orderliness and fairness to all, officials presiding over such meetings must have discretion, under the "reasonable time, place and manner" constitutional principle, to set subject matter agendas, and to cut off speech which they *reasonably* perceive to be, or imminently to threaten, a disruption of the orderly and fair progress of the discussion, whether by virtue of its irrelevance, its duration, or its very tone and manner.FN3 This obviously contemplates that in this setting the content of speech may properly be the conscious target of state action (where it is cut off for irrelevance or manner of delivery), or its collateral victim (when it is cut off for excessive duration). But this consequence assuredly lies within well-established constitutional principles, once it is accepted, as I think we must, that disruption of the orderly conduct of public meetings is indeed one of the "substan-

tive evils that [government] has a right to prevent." *Schenck*, 249 U.S. at 52, 39 S. Ct. at 249.

> FN3. The "disruption" to which this interest extends — as an "evil" to be avoided — is of course not confined to raw, physical violence, but includes any conduct that significantly violates generally or specially established rules of parliamentary order, and "disrupts" by that means the orderly conduct of a meeting.

3. As indicated, official discretion here is not limitless. The limits can be found in the well-established principle that the primary concern of the no-censorship-of-content requirement is with speaker viewpoint rather than with subject matter *per se*. *See generally* Stone, *Restriction of Speech Because of its Content: The Peculiar Case of Subject-Matter Restrictions*, 46 U. Chi. L. Rev. 81, 83, 108 (1978) (distinction noted). While the latter will yield fairly readily to time, place and manner restrictions, the former will but rarely, if ever, do so. Thus, while a ruling, "We will not listen to your views on capital punishment at this public hearing on rezoning," certainly must be constitutionally permissible, a ruling, "We will not listen to yours or any views favoring rezoning at this rezoning hearing," obviously would not be. *See City of Madison*, 429 U.S. at 175-76 & n.8, 97 S. Ct. at 426-27 & n.8 (contrasting impermissibility of viewpoint restrictions with permissibility of general subject matter restrictions in conduct of public meetings).

*Collinson*, 895 F.2d at 1000 (Phillips, J., concurring).

With these principles applicable to limited public forums in hand, we now address Steinburg's arguments, beginning with his challenge of the Commission's policy against personal attacks.

## A

On the policy against personal attacks, Steinburg claims that Commissioner Gecker interrupted him for "abusing the podium" and "criti-

cizing" Gecker by name, and he argues that Chairman Litton merely took up Gecker's cause by excluding Steinburg from the meeting. Thus, according to Steinburg, the two commissioners were in tandem and *sub silentio* enforcing the Commission's policy against personal attacks, which he argues was an unconstitutional policy under the holding of *Bach v. School Board of Virginia Beach*, 139 F. Supp. 2d 738 (E.D. Va. 2001). In *Bach*, the court struck down as unconstitutional a school board policy prohibiting speakers from making "attacks or accusations regarding the honesty, character, integrity or other like personal attributes of any identified individual or group." *Id.* at 741. The court found that

> [t]he contested provision tests the boundaries of the fine distinction between content-based and content-neutral regulations. First Amendment scholars, judges, and attorneys could engage in endless debate over whether it discriminates against speech on the basis of its content by allowing general praise while silencing criticism. Fortunately, the Court need not engage in such a comprehensive analysis, for a policy that deters individuals from speaking out on an issue of public importance violates the First Amendment. The contested provision has that effect and for that reason is unconstitutional.

*Id.* at 743 (citation omitted).

The Commission's policy against "personal attacks" focuses on two evils that could erode the beneficence of orderly public discussion. First, as an insult directed at a person and not speech directed at substantive ideas or procedures at issue, a personal attack is surely irrelevant — unless, of course, the topic legitimately at issue is the person being attacked, such as his qualifications for an office or his conduct. Second, as an insult directed at a person and not the issues at hand, a personal attack leads almost inevitably to a responsive defense or counter-attack and thus to argumentation that has the real potential to disrupt the orderly conduct of the meeting. As we observed in *Collinson*, this disruption may take the form of speaking on irrelevant subjects, of speaking too long, or of speaking in a tone or manner that threatens disruption. 895 F.2d at 1000 (Phillips, J., concurring).

The Commission has a significant interest in maintaining civility and decorum during the public comment sessions of its public meetings, both to ensure the efficient conduct of the people's business and to maximize citizen participation in the discussion. *See id.* To further these legitimate public interests, therefore, the Commission adopted a policy against personal attacks.

We conclude that a content-neutral policy against personal attacks is not facially unconstitutional insofar as it is adopted and employed to serve the legitimate public interest in a limited forum of decorum and order. Such a policy is deemed content-neutral when it "serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Moreover, denying a speaker at the podium in a Commission hearing the right to launch personal attacks does not interfere with what that speaker could say without employing such attacks. The same message could be communicated, indeed probably more persuasively, as we have witnessed in the videotape of the presentations of other speakers at the proceedings in this case. In the language of First Amendment jurisprudence, the Commission's policy in this case has left open "'ample alternative channels for communication of the information.'" *Id.* at 791 (quoting *Clark*, 468 U.S. at 293).

We therefore reject Steinburg's facial challenge to the Commission's policy prohibiting speakers from engaging in personal attacks, and we find the opinion in *Bach*, on which Steinburg relies, to be inconsistent with our jurisprudence on this issue.

Of course, this holding does not preclude a challenge premised on misuse of the policy to chill or silence speech in a given circumstance. As for Steinburg's argument that the Commission's policy was in fact used to silence him, it does not appear from the videotape or the transcript of the hearing in this case that the policy against personal attacks was invoked or applied. Steinburg argues that the policy was surely what Chairman Litton and Commissioner Gecker had in mind as they excluded him. But based on the videotape of the meeting, it appears that Chairman Litton excluded Steinburg because of his refusal to remain on subject and because of Chairman Litton's

observation, as presiding officer of the meeting, that the discussion was degenerating quickly into a situation which would disrupt the parliamentary order. As Commissioner Gecker and Steinburg had their exchange, which undoubtedly raised the temperature in the hearing room, Steinburg told Commissioner Gecker, "[Y]ou will listen to what I am saying." Gecker responded, "No, sir, you will not talk to me that way." Steinburg then started talking over Gecker. At that point, Chairman Litton took control, noting that the discussion had "gone way past" the deferral issue and instructing Steinburg to "please sit down." Steinburg refused, stating, "I'm *not* sitting down. I'm not done talking yet." When Chairman Litton explained the scope of the meeting to Steinburg and invited him to continue speaking on the deferral issue or to speak to the merits later, at the November meeting, Steinburg insisted on giving background information and demanded respect. Chairman Litton then repeated his request to Steinburg, "I'm asking you just to sit down, please." Upon Steinburg's refusal to obey his instruction, Chairman Litton excluded Steinburg from the meeting, as described in the following portion of the meeting's transcript:

CHAIRMAN LITTON: No, I think you're going to sit down now.

STEINBURG: I'm not!

CHAIRMAN LITTON (To Officer Profita):

Would you ask him to sit down, sir?

OFFICER PROFITA (To Steinburg):

Sir, you can sit down right now, or you can come with me. It's come to that option.

STEINBURG: And why am I sitting down?

OFFICER PROFITA: Disorderly conduct, for one.

| STEINBURG: | This is disorderly conduct in a public forum? |
|---|---|
| OFFICER PROFITA: | Yes, sir, they've asked you to sit down and you're not cooperating. |

Officer Profita then escorted Steinburg from the room.

It is apparent that the parliamentary order of the proceedings was put at risk by Steinburg's refusal to obey the chairman's ruling that Steinburg was out of order and the chairman's instruction to sit down.

All of the evidence in the record is consistent with Chairman Litton's intent to cut off the irrelevant, off-topic discussion, to restore order, and to prevent the meeting from spiraling out of control, as was his right and duty as chair. At no time during the meeting did Litton cite the "personal attacks" policy, nor did he ever express a view that he considered Steinburg's comments during the meeting to constitute a "personal attack." We agree with the district court's conclusion that the "evidence is insufficient to prove that Steinburg was silenced because of the policy."

B

Steinburg also contends that he was improperly excluded from the Commission meeting for expressing his viewpoint, criticizing the way the Commission was going about its business. Again, however, we conclude that the record does not support his claim that he was silenced because he expressed a particular viewpoint.

Beginning with Steinburg's discussion with Commissioner Gecker, during which Steinburg was indeed expressing criticism, there is no evidence to support a claim that Gecker silenced Steinburg's speech, nor that Gecker requested the Chairman to do so. Rather, Gecker observed about Steinburg's criticism that his "abusing this podium [was] not very flattering." After Steinburg took issue with the observation that he was abusing the podium, he instructed Gecker, "[Y]ou will listen to what I am saying." Commissioner Gecker said, "No, sir,

you will not talk to me that way. I am not going to listen to what you've got to say on a deferral motion when you come up and speak to something other than the deferral. The Old Gun Road Association —" At that point, after Steinburg interrupted Commissioner Gecker, Chairman Litton intervened and told Steinburg that Chairman Litton, as the presiding officer, was going to cut him off. Thus, Commissioner Gecker was not instrumental in any sense in silencing Steinburg. Gecker simply challenged the premise underlying Steinburg's criticism and expressed his intent not to listen. Whether expressing such an intent was an appropriate response for a commissioner can be debated, but that response did not amount to a violation of Steinburg's First Amendment rights. *See Minn. State Bd. for Community Colleges v. Knight*, 465 U.S. 271, 283 (1984) (noting that there is "no constitutional right to force the government to listen to [one's] views").

As for Chairman Litton, he did attempt to cut Steinburg off and ultimately he excluded Steinburg from the meeting. But Chairman Litton's concern was explicitly focused on having Steinburg stay on subject and on conforming his manner to the order that was necessary. Chairman Litton's first statement after announcing his intent to cut Steinburg off made clear that his motivation was purely to keep the meeting from degenerating into an irrelevant argument unrelated to the item on the agenda: "This has gone way past. I've given you the courtesy. This is nothing but a deferral. This has nothing to do with the case. So just please sit down." In response to Steinburg's question asking why he was being cut off, Chairman Litton stated directly and clearly, "Because it's strictly a deferral, and we're not arguing the case tonight. The case will be discussed at some time, at a later time." Litton even tried to afford Steinburg an opportunity to continue addressing the Commission on the deferral issue: "If you're telling me that you're in favor of the deferral, that's all I need to know. If you don't want the deferral, then that, you can argue — ." But he could not complete this offer to Steinburg to argue for or against the deferral because Steinburg interrupted him, accusing the Commission of not wanting any "background information." Chairman Litton continued to remind Steinburg that the matter before the Commission was limited in scope to the deferral of a request to change the orientation of garages, and had nothing to do with abandoned mines or the overall zoning case that had been addressed by some previous speakers.

Steinburg argues that an inference of viewpoint discrimination can be drawn from the fact that Chairman Litton permitted Frantel and Harton to speak off-topic about abandoned mines even though that subject was irrelevant to the deferral request before the Commission, whereas Chairman Litton cut off Steinburg as soon as he voiced criticism of the Commission. The record, however, does not support this argument. While Chairman Litton did permit Frantel to deliver her presentation without interruption, even though much of it was at best only tangentially related to the deferral, he also told her that the subject matter was the deferral and he received her position on the deferral. With respect to Harton, Chairman Litton reminded Harton before he began speaking, perhaps in response to Frantel's speaking off-topic, that the hearing was limited to the deferral and that he would "rather not hear the case tonight." Harton promised that he would "speak to the deferral," but he roamed off-topic and within two minutes he was interrupted twice — first by Commissioner Gecker in an attempt to determine his position on the deferral since he had not given it, and a second time by Chairman Litton to remind him once again that the topic of the public hearing was the deferral, not abandoned mines. Harton then quickly concluded his off-topic discussion.

Steinburg was treated no differently. Again he was reminded of the topic of the public hearing, but rather than address the deferral, he became argumentative and disruptive. When it became clear to Chairman Litton that Steinburg had no intention of addressing the deferral but instead intended to continue discussing irrelevant topics, he intervened to cut off Steinburg's comments.

Exercising this type of discretion is precisely what we have observed that presiding officers may do. "[O]fficials presiding over such meetings must have *discretion* . . . to cut off speech which they *reasonably* perceive to be, or imminently to threaten, a disruption of the orderly and fair progress of the discussion, whether by virtue of its irrelevance, its duration, or its very tone and manner." *Collinson*, 895 F.2d at 1000 (Phillips, J., concurring) (first emphasis added). Chairman Litton consistently stated that he was cutting Steinburg off because his comments were irrelevant and duplicative of what had come before. It is also plain from the videotape that Steinburg had raised his voice, had become argumentative, and was refusing to abide by rulings and directions of the chair. In view of these facts, we

do not agree with Steinburg's assertions that Chairman Litton's treatment of him was inconsistent with Chairman Litton's treatment of other speakers and that Chairman Litton discriminated against Steinburg's viewpoint.

We conclude that Chairman Litton acted well within his discretion as chair of the meeting to take the steps he deemed necessary to retain control, restore order, and resume progress of the meeting, and there simply is no evidence in the record to support Steinburg's claim that he was silenced for expressing his viewpoint. Again, on this issue, we affirm the summary judgment of the district court.

III

Finally, Steinburg contends that the district court abused its discretion in denying his motion to file an amended complaint to assert claims against the commissioners in their individual capacities, to challenge the Commission's time, place, and manner regulations, and to add Officer Profita as a defendant.

The district court denied Steinburg's motion, noting that Steinburg had failed to show good cause for modifying the scheduling order established under Federal Rule of Civil Procedure 16(b)(4) and that, in any event, to grant the motion would be an act of futility because Steinburg's proposed amended complaint would not survive summary judgment. The court made this assessment after discovery in the case had been fully completed and after the court had assessed Steinburg's claims on the merits.

Of course the general rule is that leave to amend a complaint under Federal Rule of Civil Procedure 15(a) should be freely given, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), unless "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile," *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (internal quotation marks omitted). A district court's decision to deny a motion to amend is reviewed for abuse of discretion. *See Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 476 (4th Cir. 2006).

Steinburg has pointed to no material in his proposed amended complaint that would have changed the analysis conducted by the district court in the context of the developed record, on which the court entered summary judgment against him. His proposed additional claims were still based on the events of the meeting on October 18, 2005, in which the defendants cut off his presentation and excluded him from the Commission meeting. Recognizing that discovery was fully completed and the district court had an excellent view of the potential claims, we can find no basis for concluding that the district court abused its discretion.

The judgment of the district court is

*AFFIRMED*.