IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-159

Filed 5 November 2025

Avery County, No. 24CR211446-050

STATE OF NORTH CAROLINA

       v.

WILLIAM J. BARTHEL, Defendant.

Appeal by defendant from judgment entered 1 August 2024 by Judge Gary M. Gavenus in Superior Court, Avery County. Heard in the Court of Appeals 26 August 2025.

*Attorney General Jeff Jackson, by Solicitor General Nicholas S. Brod, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Brandon Mayes, for defendant-appellant.*

STROUD, Judge.

Defendant William J. Barthel appeals his convictions for disrupting an official meeting and resisting a public officer. He argues that the First Amendment protects his silent display of a crude banner criticizing a county commissioner at a board meeting. We agree. The First Amendment shielded his right to stand silently at the back of the boardroom with his vulgar banner during the public comment period. Because his arrest was unlawful, Defendant had the right to resist it without using excessive force. He used reasonable force. We therefore vacate both convictions.

## I.    Background

The State's evidence tended to show that on 16 January 2024, the Avery County Board of Commissioners (Board) gathered for a "special meeting" in the Commissioners' Boardroom at the Avery County Administrative Complex in Newland, North Carolina.  Defendant arrived with a rolled-up banner under his arm. He went to the back of the boardroom and stood silently as the meeting began.

The meeting proceeded without incident through the Pledge of Allegiance.  The Board's first order of business was a public comment period.  A commissioner began reading the public comment rules. But before the comment period could even begin, Defendant unzipped his jacket, revealing a black t-shirt that bore a vulgar slogan: "Eat Pussy and Protest."  At the same time, Defendant unfurled his banner.

The banner featured Commissioner Cindy Turbyfill's photograph and the phrases: "I'm not a gynecologist, but I know a cunt when I see one!!" and "Cindy Turbyfill, Avery County's Most Unprofessional Employee."  During this display, Defendant remained silent. He merely stood near the boardroom's back wall holding his message aloft, blocking no one's view of the meeting.

Only seconds after Defendant displayed his banner, Captain Mike Watson and Deputy Caleb Hicks, the two law enforcement officers providing security, intervened. Watson approached first, asking Defendant to "please take [the banner] down" because of "what was written on [it]."  When Defendant refused, Watson called Hicks for backup.  Commissioner Tim Phillips, the Board's chairman, soon announced that

Defendant "need[ed] to leave."

Defendant demanded to know why he was being removed, invoking his constitutional rights. Hicks tried "calmly" urging Defendant's cooperation—but, as Hicks testified, Defendant "would not listen." Hicks even offered to let Defendant read the statute "for disruption of an official meeting." Defendant "refus[ed]." When Watson finally instructed Hicks to handcuff Defendant, he "kept tensing up his body" and refused to let Watson or Hicks "have his arms."

The evidence showed that the confrontation disrupted the meeting—but only after Watson asked Defendant to take down his banner and leave. Hicks testified that he could hear everything fine until Watson approached Defendant. Eventually, the officers "physically . . . remove[d]" Defendant from the boardroom into the hallway. Once there, the standoff continued. Defendant refused to leave and kept asking if he was "being trespassed under threat of arrest." His language to the two officers grew increasingly profane. At one point, when Hicks handed Defendant a copy of the disruption statute he had requested, Defendant screamed "get off me, my detention is now unlawful" and separated from Watson's grasp. He then demanded Watson's and Hicks's "name[s] and badge number[s]."

Defendant began walking backwards toward the elevator, "act[ing] like he was going to leave." He continued his profanity-laced confrontation with the officers. Then, more officers arrived. And as the elevator started opening, when Defendant was just a few inches away from the elevator doors, they arrested him and took him

into custody.

The State charged Defendant with disrupting an official meeting and resisting a public officer. *See* N.C. Gen. Stat. §§ 143-318.17 (2023) (Disruptions of official meetings), 14-223(a) (2023) (Resisting officers). After he was convicted on both charges in district court, Defendant appealed to superior court.

The case proceeded to a two-day jury trial. When the State rested its case, Defendant moved to dismiss both charges.[1] As to disrupting an official meeting, he argued that his arrest violated his First Amendment rights under *Cohen v. California*, 403 U.S. 15 (1971). In *Cohen*, the United States Supreme Court held that the defendant could not be convicted for disturbing the peace by wearing a jacket displaying "Fuck the Draft" in a California courthouse. *Id.* at 16. Because "the content of [his] banner itself . . . was the disruption," Defendant said that *Cohen* barred his conviction.

As for resisting a public officer, Defendant claimed that "every person has the right" to both "resist an unlawful arrest" and "us[e] such force as reasonably appears to be necessary to prevent the unlawful arrest." Citing *State v. Allen*, 14 N.C. App. 485, 491, 188 S.E.2d 568, 573 (1972), he argued that evidence of nothing more than "[m]ere[ ] remonstrating with an officer in behalf of another, or criticizing an officer while he is performing his duty" could not support his conviction. The trial court

---

[1] Before trial, Defendant filed a Memorandum of Law in Support of Defendant's Motion to Dismiss. His arguments at trial largely tracked those in his written memorandum.

denied both motions.

At the close of all the evidence, Defendant renewed his motions to dismiss and elected not to be heard further. The court again denied the motions. It distinguished *Cohen*, explaining that

> *Cohen* dealt with just the statement, and excuse my language, Fuck the Draft. That's what it dealt with. What specifically they said in *Cohen* . . . is not a direct personal insult, and therefore it was protect[ed] speech because it wasn't a personal insult.
>
> In this particular case, you had a direct personal insult on that banner. Not only was it insulting for anybody who was in that room, it had the picture of the person who it was directed to. So no, it isn't a free speech issue here at all, not at all.

The jury found Defendant guilty on both counts. The court sentenced him to thirty days incarceration on each count, to run consecutively, but suspended both sentences for eighteen months supervised probation. Defendant timely appealed.

## II.    Discussion

Defendant raises three challenges to his convictions. First, he argues that his arrest and conviction under North Carolina General Statute Section 143-318.17 for disrupting an official meeting violated his First Amendment rights. Second, he claims that he "had a right to resist an unlawful arrest" premised on a First Amendment violation. And third, he insists that insufficient evidence supports his conviction under North Carolina General Statute Section 14-223(a) for resisting a public officer because officers arrested him "immediately" when "the elevator door[s]

opened," denying him any "chance to get on the elevator."

We address Defendant's arguments after outlining our standard of review.

## A. Standard of Review

This Court reviews the denial of a motion to dismiss to determine whether "substantial evidence" (1) supports "each essential element of the crime" and (2) shows "that the defendant is the perpetrator." *State v. Golder*, 374 N.C. 238, 249, 839 S.E.2d 782, 790 (2020) (quoting *State v. Winkler*, 368 N.C. 572, 574, 780 S.E.2d 824, 826 (2015)). Substantial evidence means the "amount . . . necessary to persuade a rational juror to accept a conclusion." *Id.* This Court views that evidence "in the light most favorable to the State," giving it "every reasonable intendment and every reasonable inference to be drawn therefrom." *Id.*

"[W]hether the State presented substantial evidence of each essential element of the offense is a question of law," so it receives *de novo* review. *Id.* at 250, 839 S.E.2d at 790 (quoting *State v. Chekanow*, 370 N.C. 488, 492, 809 S.E.2d 546, 550 (2018)). We also review constitutional questions *de novo*. *State v. Fryou,* 244 N.C. App. 112, 125, 780 S.E.2d 152, 161 (2015).

## B. Disrupting an Official Meeting

We start with Defendant's conviction for disrupting an official meeting.

Section 143-318.17 states that a "person who willfully interrupts, disturbs, or disrupts an official meeting and who, upon being directed to leave the meeting by the presiding officer, willfully refuses to leave the meeting is guilty of a Class 2

misdemeanor." N.C. Gen. Stat. § 143-318.17. Defendant argues that his arrest and conviction under this provision rested "solely on the content of his protected speech." But because the First Amendment protects offensive and disparaging epithets, he contends that his speech "could not serve as the basis for his arrest and conviction."

Defendant brings an as-applied challenge to Section 143-318.17, not a facial challenge. He thinks that Phillips[2] and Watson violated the First Amendment by applying the statute to his particular conduct. *See Cmty. Success Initiative v. Moore*, 384 N.C. 194, 213, 886 S.E.2d 16, 32 (2023) (explaining that an as-applied challenge "represents a plaintiff's protest against how a statute was applied in the particular context in which [the] plaintiff acted or proposed to act" (citation omitted)). Our analysis thus examines whether Phillips and Watson applied Section 143-318.17 consistently with the First Amendment.

The State asserts that Defendant's arrest did not violate the First Amendment for three reasons. First, his banner was a lewd, insulting attack directed at a commissioner. Second, the Board's meeting was a limited public forum where the State has "greater discretion to restrict speech." Third, Defendant disrupted the meeting. But the State's own brief essentially acknowledges that Watson's reaction—

---

[2] Commissioner Phillips, as the Board's chairman, told Defendant to leave after Watson approached Defendant. There's some dispute in the evidence about exactly when and whether Defendant heard Phillips' directive. Viewing the evidence in the light most favorable to the State, we assume that both Phillips and Watson directed Defendant to leave. *See State v. Golder*, 374 N.C. 238, 249, 839 S.E.2d 782, 790 (2020).

not the banner itself—caused the disruption: "Video and photograph evidence supports that Defendant displayed lewd, insulting speech on the banner he brought into the Board of Commissioners meeting. *The speech evoked a reaction from Captain Watson, causing a disruption to the meeting.*" (Emphasis added.)

Despite this admission, the State maintains that it could lawfully remove Defendant because his "personal attack" was "unrelated to the public business being conducted" and "sure to trigger a disruptive response." We disagree.

The First Amendment declares that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I. That proscription, extended to the States through the Fourteenth Amendment, broadly means that the State cannot restrict speech "because of its message, its ideas, its subject matter, or its content." *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (quoting *Ashcroft v. American Civ. Liberties Union*, 535 U.S. 564, 573 (2002)). Even speech that "induces a condition of unrest," "creates dissatisfaction with conditions as they are," or "stirs people to anger" gets protection. *Texas v. Johnson*, 491 U.S. 397, 408-09 (1989) (quoting *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949)). After all, the right to free speech exists, in part, "to invite dispute." *Id.* at 408.

Still, the First Amendment has limits—it does not grant the public unlimited access to State property for speech activities. Just as a private owner can set rules for her land, so too can the State "preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida*, 385 U.S. 39, 47 (1966). The

First Amendment does not guarantee speakers access to "every type of Government property" regardless of "the nature of the property" or the potential "disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985); *see also USPS v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981) ("[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government."). Put another way, context matters—a public-school classroom presents different free speech considerations than a town square, and the State's regulatory authority varies accordingly.

The Supreme Court balances these competing interests—free speech rights versus the State's control over its property—through the public-forum doctrine. Under that doctrine, the "right of access to public property" and the limits on that right "differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983). We apply the public-forum doctrine in three steps. First, we determine whether the First Amendment protects Defendant's speech. *Cornelius*, 473 U.S. at 797. If yes, we identify the forum type, because the State's power to limit access "depends on" what type of forum it is. *Id.* Finally, we assess whether the State's reasons for exclusion "satisfy the requisite standard." *Id.*

### 1. Protected Speech

We begin with the threshold question: whether the First Amendment protects

Defendant's display at the Board's meeting.

The State says no. It argues that Defendant's banner was a "personal attack" that could have led "almost inevitably" to "a responsive defense or counter-attack." This kind of insulting conduct, the State claims, "has the real potential to disrupt the orderly conduct of the meeting." And according to the State, it did just that— Defendant's actions "disrupt[ed] . . . decorum" and "impede[d] the conducting of public business." "Defendant's insults . . . prompted a reaction from . . . Watson that immediately disrupted the meeting." The State also hints that Defendant's words fall into the narrow "fighting-words" category—speech that the First Amendment does not protect.

Defendant counters that his display falls outside "any exception to First Amendment protection." He distinguishes his case from other fighting-words precedents, noting that his banner contained "merely printed words," not the "words and disorderly conduct" found in those other cases. And even if his words "*may* constitute fighting words," Defendant asserts, criticizing "a public official in her official, public capacity" merits "the highest First Amendment protection."

Defendant has the better argument. His words do not qualify as fighting words because there was "no likelihood" that Commissioner Turbyfill "would make an immediate violent response." *Gooding v. Wilson*, 405 U.S. 518, 528 (1972). And offensive as they were, Defendant's "personal insults" describing a commissioner as a "cunt" and "unprofessional employee" remain, under these facts, mere "distasteful

mode[s] of expression." *Cohen*, 403 U.S. at 21. Although his words were crude and offensive, Defendant was expressing his disagreement with or disapproval of a public official. The First Amendment protects this speech.

### a. Fighting Words

The First Amendment generally bars the State "from proscribing speech" and "expressive conduct" based on "disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (citations omitted). But that protection is "not absolute," for the Supreme Court has "long recognized that the government may regulate certain categories of expression consistent with the Constitution." *Virginia v. Black*, 538 U.S. 343, 358 (2003) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)). The Court has carved out narrow exceptions for speech with "such slight social value" that "any benefit" is "clearly outweighed by the social interest in order and morality." *Chaplinsky*, 315 U.S. at 572.

The State, for instance, can punish speech "directed to inciting or producing imminent lawless action" that "is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). It can proscribe "true threats." *See Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam). And relevant here, it can regulate fighting words—those "personally abusive epithets" that are "inherently likely to provoke [a] violent reaction." *Cohen*, 403 U.S. at 20 (citation omitted).

The fighting-words doctrine emerged in *Chaplinsky v. New Hampshire*. There, the defendant, a Jehovah's Witness, was arrested after he called an officer "a God

- 11 -

damned racketeer" and "a damned fascist." *Chaplinsky*, 315 U.S. at 569. The incident occurred after a crowd became unruly while the defendant was distributing religious literature. *Id.* at 569-70. The Supreme Court upheld his conviction. In doing so, it established that certain words fall outside First Amendment protection—those "which by their very utterance inflict injury" or "tend to incite an immediate breach of the peace." *Id.* at 572. Such utterances are "no essential part of any exposition of ideas" and have "such slight social value" that any benefit is "clearly outweighed by the social interest in order and morality." *Id.*

The Court crafted a test: would "men of common intelligence" understand these as "words likely to cause an average addressee to fight"? *Id.* at 573. Some words, the Court explained, are "by general consent" fighting words "when said without a disarming smile." *Id.* Under this standard, calling an officer a "damn racketeer" and "damn Fascist" were, in the Court's view, "epithets likely to provoke the average person to retaliation." *Id.* at 574.

Since *Chaplinsky*, the Supreme Court has steadily narrowed the fighting-words doctrine. It hasn't "upheld a conviction under th[at] doctrine in 80 years." *Counterman v. Colorado*, 600 U.S. 66, 77 n.4 (2023).

*Cohen v. California* marked the first narrowing. There, the defendant wore a jacket emblazoned with "Fuck the Draft" in a courthouse. *Cohen*, 403 U.S. at 16. The Court reversed his conviction, ruling that the jacket's message did not constitute fighting words because it was not aimed at anyone in particular. *Id.* at 26. "No

individual actually or likely to be present," the Court reasoned, "could reasonably have regarded the words" as "a direct personal insult." *Id.* at 20. Fighting words must be "directed to the person of the hearer." *Id.* (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 309 (1940)).

A year after *Cohen*, the Court further limited the doctrine's application. In *Gooding v. Wilson*, Georgia had convicted the defendant for using "opprobrious words or abusive language" that might breach the peace. 405 U.S. at 519 (quoting Georgia Code Ann. § 26-6303). The majority opinion didn't describe the facts, but Justice Blackmun's dissent did. *Id.* at 534-37 (Blackmun, J., dissenting). The defendant had screamed at officers trying to "restore access to a public building:" "White son of a bitch, I'll kill you"; "You son of a bitch, I'll choke you to death"; and "You son of a bitch, if you ever put your hands on me again, I'll cut you all to pieces." *Id.* at 534 (Blackmun, J., dissenting).

The Supreme Court held that Georgia's statute swept too broadly, imposing criminal liability on otherwise protected speech. *Id.* at 528. As the Court observed, one Georgia court had upheld convictions for saying "God damn" and for calling someone a liar. *Id.* at 525. Another Georgia court had suggested that fighting words could breach peace "at some future time, when the person to whom they were address[ing]" was "no longer hampered by physical inability, present conditions, or official position." *Id.* at 526 (citation omitted). Expanding the definition this way— where there was "no likelihood that the person addressed would make an immediate

violent response"—effectively "license[d] the jury to create its own standard in each case." *Id.* at 528 (quoting *Herndon v. Lowry*, 301 U.S. 242, 263 (1937)). So the Court made clear that fighting words must threaten "an immediate violent response." *Id.*

These principles control here. The fighting-words doctrine requires both the right words and the right circumstances to create a genuine threat of immediate violence.

We start with immediacy. There was "no likelihood" that Commissioner Turbyfill "would make an immediate violent response" to Defendant's banner. *Id.* The evidence does not establish whether she even attended the meeting, but giving the State the benefit of every reasonable inference, we assume that she did. She didn't testify at trial, and the State presented no evidence indicating her response (if any) to the banner. Watson, however, testified that the moment Defendant "started unrolling" the banner, Watson made "contact" with him. Hicks's bodycam footage confirms this: When Defendant unfurled his banner at the back of the boardroom, none of the attendees—even those seated closest to him and visible in the video—turned around or reacted until Watson stepped in.[3]

Next, we consider the words themselves. The State never identifies exactly which words it considers fighting words, referring only to a "personal attack" and the

---

[3] The State says that "Defendant's insults . . . prompted" Watson's reaction "that immediately disrupted the meeting." But that misses the point. Fighting words must threaten "an immediate violent response" from "the person addressed"—here, Commissioner Turbyfill. *Gooding v. Wilson*, 405 U.S. 518, 528 (1972). In this respect, Watson's reaction is irrelevant.

"nature of the words themselves" that disrupted the meeting's "decorum and civility." From context, the State appears to target both phrases on Defendant's banner: "I'm not a gynecologist, but I know a cunt when I see one" and "Cindy Turbyfill, Avery County's Most Unprofessional Employee."

Start with the easier phrase. Certainly, calling someone an "unprofessional employee" may be unpleasant to that person, but this language contains no profanity and falls nowhere near the fighting-words standard. That leaves the profane phrase—indirectly calling Commissioner Turbyfill a "cunt"—as the State's likely fighting-words candidate because it was "directed to the person of the hearer" (or here, the reader).[4] *Cohen*, 403 U.S. at 20 (quoting *Cantwell*, 310 U.S. at 309). But the fighting-words doctrine requires more than unpleasant or unwelcome words "directed" at the person who sees or reads them. It demands words that are "personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Id.* (citing *Chaplinsky*, 315 U.S. at 568).

Precedent demonstrates that Defendant's words fall short of this exacting standard. The Supreme Court has set the bar high. Consider *Gooding*, where the defendant screamed death threats at officers face-to-face: "I'll kill you," "I'll choke you to death," and "I'll cut you all to pieces." *Gooding*, 405 U.S. at 534 (Blackmun, J.,

---

[4] Again, we assume that Commissioner Turbyfill was at the meeting and could see and read the banner.

dissenting). These were not mere insults—they were direct threats of violence, delivered during a heated face-to-face confrontation. Yet the Court found even those words protected.

Our State Supreme Court has found fighting words only once—where a white man "loudly and repeatedly" called a Black patron the n-word, intending to "provoke a confrontation." *In re Spivey*, 345 N.C. 404, 408, 480 S.E.2d 693, 695 (1997). The Court explained why this qualified; "No fact is more generally known than that a white man who calls a black man" that word "within his hearing will hurt and anger the black man and often provoke him to confront the white man and retaliate." *Id.* at 414, 480 S.E.2d at 699. Three factors thus converged: the slur's unique historical capacity to provoke violence, its repeated use, and evidence the speaker specifically "intended" to provoke confrontation. *Spivey* was a "classic" fighting words case—the rare instance where words are so inherently provocative that violence becomes predictable. *Id.* at 415, 480 S.E.2d at 699.

Defendant's banner does not approach the fighting-words standard. His crude language lacks the direct menace of *Gooding*'s face-to-face death threats—or, more bluntly, the defendant's threats to kill, choke, and dismember officers. It also lacks the historical violence-inducing quality of *Spivey*'s racial slurs, words with a clear capacity to provoke immediate physical retaliation. Even Defendant's delivery undermines any fighting-words claim. Defendant stood silently at the back of the boardroom with his sign. No verbal confrontation occurred. No face-to-face encounter

designed to provoke violence transpired. His words, however offensive, were just "distasteful mode[s] of expression." *Cohen*, 403 U.S. at 21.

We do not suggest that only death threats or racial slurs can constitute fighting words. But these cases illustrate the high bar: words must be so inherently inflammatory, delivered in such provocative circumstances, that immediate violence becomes likely. Defendant's silent display of a banner with insults and the word "cunt" directed at a particular person falls well below that threshold.

### b. Criticism of an Elected Official

Because Defendant's words are not fighting words, we now determine whether the First Amendment protects his speech.

The First Amendment shields offensive speech. If there's "a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Johnson,* 491 U.S. at 414. That protection becomes greater still when citizens criticize their government. The "First Amendment interest in fostering speech" is "particularly substantial" when someone critiques how "an elected official has chosen to carry out" her duties. *State v. Taylor*, 379 N.C. 589, 606, 866 S.E.2d 740, 754 (2021); *see also Cheryl Lloyd Humphrey Land Inv. Co., LLC v. Resco Prods., Inc.*, 377 N.C. 384, 385, 858 S.E.2d 795, 797 (2021) (acknowledging the defendants' First Amendment rights "to petition the government when speaking at . . . public zoning hearings"). Such criticism "safeguards our democracy by keeping elected

representatives accountable." *Id.*

Defendant's banner did exactly that—it criticized a public official's job performance. The banner disparaged Commissioner Turbyfill and used a single crude word. But the Supreme Court has been clear: A State cannot ban speech simply because it offends. *Johnson,* 491 U.S. at 414; *see also Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975) ("Much that we encounter offends our esthetic, if not our political and moral, sensibilities[,] . . . [but] the Constitution doesn't permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer."). It cannot require citizens to be polite when criticizing their representatives. And it cannot arrest someone for expressing displeasure with an elected official, however bluntly expressed.

The First Amendment draws no distinction between refined political discourse and coarse personal attacks on elected officials. Defendant's speech is protected.

### 2. *Limited Public Forum*

Having concluded that Defendant engaged in protected speech, we turn to where it occurred. *Cornelius*, 473 U.S. at 797.

The State contends that the Board meeting was a limited public forum—a space that the government has "opened for expressive activity by part or all of the public" on a temporary basis. *Durham Cnty. Dep't of Soc. Serv. v. Wallace*, 295 N.C. App. 440, 453, 907 S.E.2d 1, 11 (2024) (quoting *Int'l Soc. for Krishna Consc. v. Lee*,

505 U.S. 672, 678 (1992)). It asserts that by "reserv[ing] time for public participation" during its meeting at a government facility, the Board created such a forum. We agree.

Courts divide "government property into three categories." *Christian Legal Soc. v. Martinez*, 561 U.S. 661, 679 n.11 (2010). Traditional public forums—parks, streets, and sidewalks—are places that "have immemorially been held in trust for the use of the public" and "have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry,* 460 U.S. at 45 (citation omitted). Designated public forums are spaces that have not "traditionally been regarded as a public forum" but which the State has "intentionally opened up for that purpose." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009). These include municipal auditoriums or public theaters that the State has deliberately made available for expression. Limited public forums are the most restrictive: government property "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Id.* at 470. Examples include public meetings where speakers must address only agenda items, or student forums that exclude outside organizations.[5]

Here, the Board created a limited public forum. Anyone from the "general

---

[5] The key distinction between a limited public forum and a designated public forum turns on restrictions: If the government limits who can speak or what topics they can address, it has created a limited forum, not a designated one. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015).

public" could speak, but they could only address "any agenda item under consideration by the [B]oard." This content-based restriction makes the forum limited rather than designated or traditional. Defendant does not dispute this classification. He argues instead that the public-forum doctrine does not apply at all—that we should skip straight to whether the Board engaged in content-based "censorship."

That reverses the analysis. The defining feature of a limited public forum is that a State may impose content-based restrictions there. *Summum*, 555 U.S. at 470 ("[A limited public] forum . . . is limited to use by certain groups or dedicated solely to the discussion of certain subjects."). The State could, for instance, limit speakers at a zoning hearing to comments about the specific development proposal under consideration. These content limits define the forum itself. So the question is not whether the restriction is content-based—in limited forums, it often is. The question is whether it's "reasonable and viewpoint neutral." *Id.* As the Supreme Court has explained, applying strict scrutiny to content-based restrictions in this context "would, in practical effect, invalidate a defining characteristic of limited public forums." *Martinez*, 561 U.S. at 681 (citation omitted).

The Board's forum served a specific purpose. The evidence shows that the Board's public comment period exists to "allow[ ] members of the public the opportunity to offer comments and suggestions for the efficient and effective administration of government." Every public comment period serves this same basic

function—creating "a forum for public discourse and decisionmaking." Robert C. Post, *Between Governance and Management: The History and Theory of the Public Forum*, 34 UCLA L. REV. 1713, 1799 (1987).

And Defendant's speech fell within these content boundaries. The Board's rules didn't prohibit displaying banners during public comment, and the evidence does not indicate that either Phillips or Watson objected to banners or comments about commissioners generally. Though one word was offensive, Defendant's banner commented on the "efficient and effective administration of government" by critiquing the commissioner's alleged "unprofessional" performance. His speech thus aligned with the forum's stated purpose.

### 3. Legal Standard for Limited Public Forums

We now assess whether the State's "justifications" for removing Defendant from the meeting "satisfy the requisite standard." *Cornelius*, 473 U.S. at 797.

In a limited public forum, the State need not "allow persons to engage in every type of speech." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). But it cannot "discriminate against speech on the basis of its viewpoint," and any "restriction must be 'reasonable in light of the purpose served by the forum.' " *Id.* (quoting *Cornelius*, 473 U.S. at 806). We first examine whether Watson and Phillips applied Section 143-318.17 in a viewpoint-neutral manner, and if not, whether their restriction was nonetheless reasonable.

*a. Viewpoint Discrimination*

The State claims that Watson removed Defendant for the "crude, personal attack that disrupted the meeting," not for his opinion about Commissioner Turbyfill. Defendant disagrees: In his view, Watson targeted the banner because he disagreed "with [its] message." Defendant contends that a banner praising Commissioner Turbyfill as "a fantastic person and county employee" never would have prompted his removal.

Viewpoint discrimination targets particular perspectives on a topic—barring criticism while allowing praise, or vice versa. Phillips and Watson's restriction did just that: they objected to words that expressed negative views about a commissioner through personal "attack[s]" or "insults." This constitutes viewpoint discrimination.

Viewpoint discrimination occurs when the State targets "not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819, 829 (1995) (citing *R.A.V.,* 505 U.S. at 391). It is "an egregious form of content discrimination." *Id.* The State thus violates the First Amendment "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* (citing *Perry,* 460 U.S. at 46).

Here, Watson testified that he asked Defendant to remove the banner because of "what was written on [it]." The State does not argue that it would have barred *any* banner mentioning a commissioner. In fact, it specifically claims that "Watson would have taken the same action" if "another person had silently displayed words on a banner that attacked a [c]ommissioner—*but used similarly inappropriate and*

*offensive language to deploy personal insults.*" (Emphasis added.) Watson, the State insists, "was not motivated by a 'desire to suppress a particular point of view.'"

This restriction, however, amounts to viewpoint discrimination because Watson's actions targeted Defendant's perspective, not the subject matter. By restricting only "inappropriate and offensive language to deploy personal insults" about commissioners, the State reveals that Watson's actions turned on the "particular views taken by [a] speaker[ ] on a subject," not the subject itself. *Id.* (citing *R.A.V.,* 505 U.S. at 391). Defendant's banner assessed a commissioner's professionalism—which is commentary on the "efficient and effective administration of government" that the forum was designed to accommodate. The State would allow positive assessments of a commissioner's performance but forbids negative ones expressed in crude terms. This distinction—allowing praise while barring criticism based on offensive language—is impermissible viewpoint discrimination.

Even assuming Phillips and Watson would have removed any banner using offensive language (whether it praised or criticized a commissioner), this restriction still fails the reasonableness test.

*b. Reasonableness*

The State asserts that Phillips and Watson reasonably applied Section 143-318.17 because Defendant's "conspicuous, eye-catching banner with vulgar insults" destroyed the meeting's decorum. In the State's view, officers may act prophylactically, removing speakers before any actual disruption occurs to preserve

order. Even though Defendant stood silently in the back of the boardroom, as the State acknowledges, it argues that his "personal attack" still disrupted the meeting because it was "unrelated to any topic being discussed."[6]

The State's decision to restrict speech in a limited public forum "need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. Courts assess reasonableness by examining the forum's "function" and "all the surrounding circumstances." *Martinez*, 561 U.S. at 685 (quoting *id.* at 809). To be sure, the State may enforce rules preserving "the civility and decorum necessary to further the [limited public] forum's purpose of conducting public business." *Steinburg v. Chesterfield Cnty. Plan. Comm'n*, 527 F.3d 377, 385 (4th Cir. 2008); *see also State v. Barber*, 281 N.C. App. 99, 108, 868 S.E.2d 601, 607 (2021) ("[E]ven if our General Assembly . . . [is] a limited public forum, the General Assembly would still be allowed to enforce rules limiting the volume of visitor speech in the . . . areas where staff carry on the work of our legislative branch."). But Watson didn't enforce meeting rules; instead, he censored offensive speech.

Section 143-318.17 prohibits conduct that "interrupts, disturbs, or disrupts an official meeting." N.C. Gen. Stat. § 143-318.17. But the evidence shows that Defendant's banner caused no disruption, until Watson intervened. Defendant stood

---

[6] This is wrong. As discussed above, the banner fell within the public comment period's content restrictions. Defendant's commentary on a commissioner's job performance relates to the "efficient and effective administration of government."

at the back where his banner blocked no one's view, and Hicks's testimony suggests that he could hear the meeting clearly until Watson's confrontation. The bodycam footage also tends to show that no attendees noticed the banner until Watson acted—they sat facing forward, away from Defendant, with no one near him. Simply put, the meeting proceeded normally until Watson created the very disruption he claimed to prevent.

The lack of actual disruption reveals what drove Watson's decision: the offensive words themselves. He removed Defendant, as Watson himself testified, because of "what was written on the banner"—not because banners were prohibited or because the display disturbed attendees. The State admits that it was the "nature of the words themselves" that triggered removal, despite being "silently communicated." And at oral argument, the State's counsel confirmed that Watson enforced "a ban on (1) profanity, (2) a personal attack, and (3) a banner." Oral Argument at 12:16, *State v. Barthel* (No. 25-159) (Aug. 26, 2025), https://www.youtube.com/watch?v=YK97U_m5BMg (last visited September 5, 2025).

While the State can impose content-based restrictions in a limited public forum, those restrictions must serve the forum's purpose—here, facilitating public comment on government business. *Cornelius*, 473 U.S. at 806. The State can limit speakers to agenda items, enforce time caps, or prohibit actual disruptions. But it cannot ban offensive words or criticism of public officials under the guise of maintaining order. Such restrictions, even if the words used are unpleasant,

constitute viewpoint discrimination.

What is more, the State's approach grants officials unlimited discretion to silence speech. If officials can remove speakers based solely on offensive language or "personal insults"—even when any disturbance results from the official's intervention rather than the speech itself—then government can suppress unpopular speech according to speculative concerns. Officials could silence speakers based on predicted reactions from anyone at the meeting, not just the criticism's target. Indeed, the State's brief makes this clear: It would prohibit criticism of any commissioner using "inappropriate and offensive language to deploy personal insults" because such words are "necessarily likely to disturb the peace." *Johnson*, 491 U.S. at 408. But the Supreme Court has, time and again, rejected this approach.

Take *Cohen*. There, the Court warned against States "indulg[ing] the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process." *Cohen*, 403 U.S. at 26. Otherwise, the Court said, "governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views." *Id*. States, however, have "no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us." *Id*. at 25.

This principle reflects free speech's essential purpose. The First Amendment serves its "principal function" when it "invites dispute," even when speech "induces a condition of unrest" or "stirs people to anger." *Johnson*, 491 U.S. at 408-09 (quoting

*Terminiello,* 337 U.S. at 4). Maintaining meeting decorum represents a legitimate government interest. But Watson and Phillips went too far. They invoked Section 143-318.17 to remove Defendant without any actual "interrupt[ion], disturb[ance], or disrupt[ion]." N.C. Gen. Stat. § 143-318.17. In doing so, they targeted Defendant's critical viewpoint about a public official—precisely the kind of discrimination the First Amendment forbids. *R.A.V.*, 505 U.S. at 392 (ruling that the government cannot impose "selective limitations upon speech"). Watson and Phillips acted based on "the offensive content of [Defendant's] particular message," not any genuine disruption. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010).

In sum, Defendant's removal fails the reasonableness test. He silently displayed a banner criticizing a commissioner's job performance at the back of the boardroom—a banner that blocked no one's view and caused no observable disruption to the proceedings. Removing him served no legitimate purpose of facilitating orderly public comment. Rather, it accomplished only one thing: censoring speech the officials found offensive. Even in a limited public forum, such censorship exceeds the constitutional bounds of reasonable regulation.

We therefore vacate Defendant's conviction under Section 143-318.17.

## C. Resisting a Public Officer

Finally, we turn to Defendant's conviction for resisting a public officer under Section 14-223(a).

Defendant advances two arguments. First, he had a right to resist an unlawful

arrest that was "premised" on protected First Amendment activity. Second, the evidence cannot support his conviction because he was arrested "immediately as the elevator door opened," giving him no chance to comply with the officers' orders. Defendant characterizes his confrontation with Watson and Hicks before "reaching the elevator" as "simply remonstrating." The State, however, maintains that sufficient evidence supports Defendant's conviction under the five-element test this Court stated in *State v. Carter*, 237 N.C. App. 274, 765 S.E.2d 56 (2014) for Section 14-223(a) violations. We disagree.

Section 14-223(a) makes it a "Class 2 misdemeanor" to "willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge an official duty." N.C. Gen. Stat. § 14-223(a). To convict, the State must prove:

> 1. that the victim was a public officer;
>
> 2. that the defendant knew or had reasonable grounds to believe that the victim was a public officer;
>
> 3. that the victim was discharging or attempting to discharge a duty of his office;
>
> 4. that the defendant resisted, delayed, or obstructed the victim in discharging or attempting to discharge a duty of his office; and
>
> 5. that the defendant acted willfully and unlawfully, that is intentionally and without justification or excuse.

*Carter*, 237 N.C. App. at 279, 765 S.E.2d at 60 (citation omitted). The offense's third element "presupposes lawful conduct of the officer in discharging or attempting to

- 28 -

discharge a duty of his office." *Id.* (quoting *State v. Sinclair*, 191 N.C. App. 485, 489, 663 S.E.2d 866, 870 (2008)); *see also State v. Mobley*, 240 N.C. 476, 478, 83 S.E.2d 100, 102 (1954) ("The offense of resisting arrest, both at common law and under the statute, [Section] 14-223, presupposes a lawful arrest.").

North Carolina law recognizes that "every person has the right to resist an unlawful arrest." *Mobley*, 240 N.C. at 478, 83 S.E.2d at 102*; see also, e.g., State v. Sanders*, 303 N.C. 608, 622, 281 S.E.2d 7, 15 (1981) (same); *State v. Sparrow*, 276 N.C. 499, 512, 173 S.E.2d 897, 905 (1970) (same). When officers make an unlawful arrest, they stand "in the position of a wrongdoer and may be resisted by the use of force, as in self-defense." *Id.* (citations omitted). But this right has limits. A person "may use only such force as reasonably appears to be necessary to prevent the unlawful restraint of his liberty." *Id.* at 479, 83 S.E.2d at 102.

The State does not dispute this right or argue that Defendant used force beyond what was "reasonably. . . necessary to prevent" his unlawful arrest. *Id.* Instead, it assumes that the arrest was lawful and contends that sufficient evidence supports Defendant's conviction.

That assumption is wrong. An arrest violating the First Amendment does not satisfy Section 14-223(a)'s third element, which (again) "presupposes lawful conduct of the officer in discharging or attempting to discharge a duty of his office." *Carter*, 237 N.C. App. at 279, 765 S.E.2d at 60 (quoting *Sinclair*, 191 N.C. App. at 489, 663 S.E.2d at 870). Here, we have already concluded that Defendant's arrest was

unlawful, and that the evidence taken in the light most favorable to the State does not show that he used force beyond what was reasonable in the circumstances.

Defendant's resistance was almost entirely verbal. He repeatedly asserted his right to speak, asked if he was being trespassed, and used profanity as officers removed him from the boardroom into the hallway. The only physical resistance was that Defendant "kept tensing up his body" and refused to let Watson or Hicks "have his arms" for handcuffing. The record contains no evidence—and the State does not posit—that Defendant took any offensive physical action against the officers or used excessive force. Because his arrest violated the First Amendment, he had the right to resist it using reasonable force. He remained within those bounds.

So we vacate Defendant's conviction under Section 14-223(a).

### III. Conclusion

For the reasons explained above, we vacate Defendant's convictions for disrupting an official meeting and resisting a public officer.

VACATED.

Chief Judge DILLON and Judge GORE concur.